IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THERMO FINNIGAN LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1505 (GMS) |
| | ) | |
| APPLERA CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

1. A *Markman* hearing for the purpose of construing the disputed terms of U.S. Patent No. 5,385,654 (filed July 7, 1993) ("the '654 Patent") is scheduled for Thursday, March 16, 2006. In the interest of efficiency, the court will direct the parties to allocate a sufficient portion of their respective presentation times to address the following queries.

2. Regarding the term "capillary electrophoresis," the court queries why neither party's proposed construction mirrors the definition set forth in the specification, *i.e.*, a "method to separate small analytes [*e.g.*, anions] at very low concentration levels by exploiting the different mobilities of sample components in an electric field." '654 Patent col.1 ll.19-22. Is there a difference between capillary zone electrophoresis and capillary electrophoresis? If the court were to adopt this construction, would it be inconsistent for the court to simultaneously reject the defendant's proposed construction of "anions"? In other words, is it possible for an anion to be "small" without also being "low molecular weight" and "monomeric"?

3. Regarding the term "carrier electrolyte," how does the defendant respond to the plaintiff's argument that "any electrically conductive fluid medium" fails to account for the qualifier

"for the sample" used in the patent? Conversely, how does the plaintiff respond to the defendant's argument that the "'654 patent claims a method of detecting and separating *anions*, not all ions"? (D.I. 75 at 11 (emphasis in original).)

4. Regarding the phrase "maintaining the termperature . . . ," is there any intrinsic or extrinsic evidence that the thermal-control system disclosed in U.S. Patent No. 5,066,382 (filed Jan. 25, 1990) ("the '382 Patent") would work for a system that uses "liquid circulating around the capillary" or "metal radiator plates" to maintain the temperature? In other words, does the thermal-control system claimed by the '382 Patent only work in a system that uses circulating air?

5. Would it be accurate to construe the term "electoosmotic flow" as "the bulk flow of liquid due to the effect of an electric field on positively charged ions (cations) adjacent to the negatively-charged capillary wall"? Is the plaintiff correct that such a definition would lead to one-directional flow? Is the court incorrect in understanding that flow reversal is actually the result of the addition of an electroosmotic flow modifier that adds cationic molecules to the capillary wall, such that the wall essentially assumes a positive charge?

6. Regarding the term "electroosmotic flow modifier," the court queries why neither party's proposed construction mirrors the definition set forth in the specification, *i.e.*, a substance that "controls the speed and/or direction of the electroosmotic flow of the carrier electrolyte." '654 Patent col.2 ll.65-67. Is the court incorrect in understanding that the electroosmotic flow can be enhanced (*i.e.*, sped up in the direction of the cathode) through the use of an electroosmotic flow modifier that adds anionic molecules to the capillary wall? In other words, why does the defendant's proposed construction limit electroosmotic flow modifiers

2

to those that only add cationic molecules to the capillary wall?

IT IS HEREBY ORDERED THAT:

The parties allocate a sufficient portion of their respective presentation times at the March 16 *Markman* hearing to address the above queries.

Dated: March 9, 2006

_____
UNITED STATES DISTRICT JUDGE



FILED

MAR 9 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE